IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

vs.                             CR. No. 17-2381 JCH

**BRENDA AMELIA JIMENEZ,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a *Motion to Suppress Statements and Evidence* [Doc. 43] filed by Defendant Brenda Amelia Jimenez (hereafter, "Jimenez") and joined by Defendant Edgar Gomez-Guzman (hereafter, "Gomez"). Doc. 45. On Tuesday, January 16, 2018, the Court held an evidentiary hearing on the motion, at which both defendants were present and represented by counsel. Following the hearing, all parties were given the opportunity to file written closings and rebuttal arguments [Docs. 53 and 55]. After considering the parties' briefs, the evidence and arguments presented at the hearing, as well as the written closing arguments, the Court concludes that the motion to suppress should be denied.

## FINDINGS OF FACT

For the sole purpose of ruling on the motion to suppress, the Court makes the following findings of fact:

On the night of Saturday, August 19, 2017, Drug Enforcement Agency ("DEA") Special Agent Jarrell Perry went to the Greyhound bus station in Albuquerque, New Mexico. Task Force Officer ("TFO") Seth Chavez of the Valencia County Sheriff's Office, who was assigned to the

DEA, accompanied Agent Perry. The pair arrived at the bus station shortly before 9:30 p.m. in order to check the eastbound bus as it stopped in Albuquerque. When the bus arrived, Perry stood nearby and watched the passengers step off. Perry observed both defendants retrieve luggage from underneath the bus: Gomez picked up a green, hard-sided suitcase, while Jimenez retrieved a maroon suitcase. Then, the two walked toward the front of the bus station. Perry did not follow or keep track of them after that.

When the bus was empty, Greyhound had it washed and serviced. Afterwards, Perry and Chavez examined the checked luggage on the bus. Then, the two boarded the bus and spoke to the passengers who got on. When they were done, Perry and Chavez got off the bus, which departed at approximately 11:15 p.m. There is no evidence that either of the defendants was on the bus while Perry and Chavez were onboard.

At approximately 11:30 p.m., Perry and Chavez walked from the boarding area into the bus station and then continued out the front door toward First Street. Perry saw Gomez and Jimenez, who were sitting on the curved wall in front of the bus station with their luggage. They sat facing the bus station, with their back to the street. Perry approached the couple from the sidewalk on the other side of the wall. He asked them how they were doing. Remaining seated on the wall, Gomez and Jimenez looked at him over their shoulders and said they were "good." Then Perry displayed his badge, identified himself as a police officer, showed them his badege, and asked if he could speak with them. Both defendants said "yes." Perry pointed to Chavez, who was about 50 feet away, standing under the archway in front of the bus station, and told defendants that Chavez was his partner. Noticing that Gomez had an accent, Perry asked him if he spoke English. Gomez said, "A little." As a result, Perry began speaking Spanish to Gomez. He identified himself as a police officer and asked permission to speak to Gomez, who said yes.

2

Perry was not in uniform and did not display a weapon. The area in front of the bus station was well lit.

Perry asked if he could see Gomez and Jimenez's bus tickets. The pair handed him their tickets, which were for passage from Flagstaff, AZ to Billings, MT. Perry returned the tickets. The bus going to Billings was scheduled to depart several hours later, around 2:25 a.m. Then, Perry asked them if they had identification with them. Again, the pair complied with the request, and Perry reviewed and returned their IDs. Perry began asking questions in English, which Jimenez answered. He asked where they were going, and she told him they were heading to Denver, CO. Jimenez also told Perry that the two were a couple who lived together in Phoenix and were traveling to Denver to visit a friend for approximately one week. Perry asked if they planned to return by Greyhound bus, and Jimenez responded that they might return to Phoenix by car.

Perry then asked both defendants if they had any luggage with them. Gomez identified the green, hard-sided suitcase that Perry saw him remove from the bus, as well as a camouflage backpack. Jimenez claimed the maroon suitcase Perry saw her remove from the bus, along with a purse and a small duffel bag that was resting on top of the green suitcase. Perry walked around the end of the wall on which the defendants were sitting so that they were facing him, and stood a few feet away from their luggage. Perry asked Jimenez for consent to search her luggage for contraband, and she verbally responded, "Yes." Perry searched the maroon suitcase, the small duffel bag, and the purse, and found nothing of interest. At some point during the search process, Chavez moved closer, finally standing within a few feet of Perry and the defendants.

Perry then asked Gomez in Spanish for consent to search his luggage for contraband. Gomez, responding in Spanish, agreed. Perry searched the green suitcase and found a small pink

3

bag of the type often used for giving gifts. At this point, Jimenez lowered her head and shoulders in a manner that Chavez perceived as though she had been caught in something or was in trouble. Perry removed the gift bag and looked inside, where he saw two clear plastic containers that contained a clear crystal-like substance that, based on his training and experience, was consistent with crystal methamphetamine. Perry gave a signal to Chavez, and they arrested Jimenez and Gomez. They then transported the defendants to the DEA's Albuquerque district office, where the crystalline substance field tested positive for the presence of methamphetamine.

## DISCUSSION

### I. The Initial Encounter Was Voluntary

The Fourth Amendment, applied to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), prohibits unreasonable seizures by law enforcement officers. U.S. Const. amend. IV. But "[t]he Fourth Amendment does not proscribe all contact between the police and citizens." *INS v. Delgado*, 466 U.S. 210, 215 (1984). For instance, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)). These are referred to as consensual encounters which do not implicate the Fourth Amendment. *See United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006). It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). "[T]he test allows officers to make inquiries so long as they don't throw their official weight around unduly." *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). There are no per se rules that govern this inquiry. "Rather, every case turns on the totality of the circumstances presented." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc)).

The Tenth Circuit has enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Lopez*, 443 F.3d at 1284 (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). "Although no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (quoting *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006)).

The Court notes that most of the factors the Tenth Circuit listed in *Lopez* weigh in favor of concluding that the encounter was voluntary. The location of the encounter—outside, near the sidewalk in front of a joint bus and train station—is an open, public place. Although some locations might be quite deserted at 11:30 p.m., there is no evidence that was the case here.[1] The Albuquerque Greyhound Bus Station, located in downtown Albuquerque on First Street near Central Avenue, is in a part of town that remains busy at 11:30 p.m. on a typical Saturday night, with bars and a movie theater nearby that remain open at that time. There was adequate lighting as well. Second, Perry and Chavez did not touch or otherwise restrain either defendant, and both wore plain clothes without any display of weapon. There were two officers and two defendants, so the defendants were not overwhelmed by the number of officers present. There is no evidence that Chavez spoke to them at all or that Perry used a threatening tone or demeanor. At the start of the encounter, Chavez was about 50 feet away, and then as the conversation went on he moved closer, winding up a few feet away from the defendants and their luggage. Nothing in the record suggests that he was uncomfortably close to them. And, although Perry did ask to see the defendants' identification and tickets, he returned them to the defendants immediately. Only one *Lopez* factor weighs in favor of finding the encounter involuntary—Perry did not tell the defendants that they had the right to terminate the encounter or refuse consent.

In her briefs [Docs. 44 and 48] and in her written closing argument [Doc. 53], Jimenez argues that the following circumstances (in addition to Perry's failure to tell the defendants that they could walk away or refuse to talk to him) made the initial encounter with Perry involuntary:

---

[1] Jimenez argues that "no one else was around" during defendants' encounter with Perry. Doc. 53 at 11. She cites Exhibits 1-3 in support of that contention. However, nothing in the record states that the photos were taken at the time of the encounter, or that no other people were in the area. The testimony states only that the photographs accurately depict the area outside the bus station where the encounter took place.

6

(1) Perry boarded the bus to talk to passengers after it was serviced and all of them complied, which created an "ambiance of implicit duress and coercion," e.g., a certain pressure or an expectation that people must talk to him; (2) Perry knew that defendants had gotten off the bus and were waiting for a connecting bus and that Jimenez could not walk away, as she had to wait for her connecting bus; (3) TFO Chavez was present, and moved to just a few feet away as Perry was talking with defendants; (4) Perry never asked Jimenez if her travel plans had changed and therefore never gave her the opportunity to negate the suspicion raised by having a destination that did not match her ticket; (5) instead of informing the defendants that he was a DEA Agent performing drug interdiction, Perry told them that he was a "police officer" who was there for security purposes.[2] Jimenez argues that under these circumstances, a reasonable person would not have felt free to decline to answer Perry's questions. The Court addresses each in turn.

First, there is no evidence that defendants knew or could have known that Perry boarded the bus and spoke to passengers, or that all the passengers agreed to speak to him and Chavez. That being the case, there is no evidence that other passengers' encounters with Perry and Chavez would have affected the reasonableness of defendants' beliefs about their own right to terminate the encounter. Second, the Court is unconvinced by Jimenez's argument that she was not free to walk away from Perry and Chavez because she was waiting for her connecting bus. The evidence in the record is that defendants' bus arrived in Albuquerque around 9:30 p.m., and their connecting bus to Billings was scheduled to depart at approximately 2:25 a.m. Therefore, when Perry approached the defendants at around 11:30 p.m., defendants still had around three

---

[2] Perry testified that when he conducts consensual encounters, he typically informs passengers that he is checking the station for security reasons, but that he does not recall whether or not he told the defendants that on this particular occasion. Because Perry testified that it is his habit to do so, the Court assumes for the sake of argument that he did indeed inform the defendants that he was at the station for security purposes.

hours before their bus was set to leave Albuquerque, which certainly left them enough time to leave the bus station without risk of missing their connection. Therefore, the Court rejects Jimenez's contention that the bus schedule prevented them from terminating the encounter. Third, although Chavez did move closer to Perry and the defendants as the encounter progressed, he stood a few feet away. There is no evidence that he loomed over the defendants or behaved in a threatening manner. Further, a law enforcement officer standing a few feet away from one's partner during an encounter is not unreasonable. Fourth, it is not clear to the Court how or why Perry's failure to ask Jimenez if her travel plans had changed affects the voluntariness of the encounter. Jimenez does not explain how she would have felt more free to walk away from Perry if he had asked that question. The Court assumes that, while Jimenez made this argument in relation to voluntariness, instead this issue is more pertinent to the question of whether Perry and Chavez had probable cause to arrest Jimenez. Thus, the Court addresses this argument below.

Jimenez's fifth and final argument is that instead of informing the defendants that he was a DEA Agent performing drug interdiction, Perry improperly told them that he was a "police officer" who was there for security purposes and looking for contraband. Relying on the opinion of another district judge in *United States v. Easley*, Cr. No. 16-1089 MV, Doc. 49 (D.N.M. Jan. 10, 2018) (slip op.) (Vazquez, J.), Jimenez contends that "Perry's approach of introducing himself as a police officer who is checking the bus 'for security' as an attempt to assert authority and confuse passengers into believing they could face physical danger if they did not comply with his requests." Doc. 53 at 10-11 (quoting *Easley*, Cr. No. 16-1089 MV, Doc. 49 at 22). According to Jimenez, "[b]y being vague as to his purpose, SA Perry deprives passengers of an opportunity to understand the situation, let alone exercise their right to decline consent." *Id*. at 11 (quoting *Easley*, *supra*, at 25). The Court does not agree with this argument. First, the totality of

8

the circumstances surrounding the issue of consent in *Easley* was quite different than here. In *Easley*, the defendant's race was a factor in a way not presented here. Further, unlike in *Easley*, in this case Perry did not encounter the defendants on the bus or ask them to get off the bus to speak with him. Thus, the defendants in this case had considerably greater freedom to decline Perry's requests to speak with them and to search their luggage. In fact, in *Easley* Perry not only talked to the defendant on the bus and searched her person and her belongings, but then later removed the defendant's suitcase from the belly of the bus and asked her to step off and answer further questions. Under those circumstances, it is understandable that the defendant would feel that she had little choice but to consent. However, as discussed herein, the circumstances of the encounter presented in this case were such that defendants had quite a bit of freedom to decline to talk to Perry or allow him to search their luggage.

Finally, the Court does not agree with the court's conclusion in *Easley* that a DEA agent improperly attempts to assert authority and confuse passengers when he identifies himself as a police or law enforcement officer who is checking the bus for "security." In this Court's view, drug interdiction is not an act that is separate and apart from ensuring security on buses, trains, or airplanes. In fact, drug interdiction is very much a part of the broader concept of security on public transportation because the use of public transportation for the conveyance of illegal substances invites various threats, including violence, to the traveling public. For this reason, it is well known that the Transportation Safety Administration ("TSA"), which is responsible for security in our nation's airports, intercepts illegal narcotics as well as weapons on airplanes as a part of its security measures. Second, it is not clear to this Court how or why a reasonable person might feel free to decline an encounter with someone who identifies himself as a DEA agent, but yet somehow feel more constrained if they are told the person is a police officer, as *Easley* seems

to imply. *See Easley*, *supra*, at 23. The Court is also unpersuaded by *Easley*'s suggestion that when law enforcement officers tell bus passengers that they are checking a bus for "security purposes," that statement is akin to falsely telling a defendant that they have received an anonymous tip that there are drugs and bombs in the a defendant's apartment. *Id*. (citing *United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011)). The latter puts a defendant in direct fear of being killed or wounded by a specific threat against him and therefore places undue pressure on that individual to consent to a search of his dwelling for the sake of his own safety. On the other hand, the former merely informs a defendant that the officer is on the lookout for security threats generally. In any event, while *Easley* may have some persuasive authority, it is not binding on this Court, which disagrees with its reasoning.

Having reviewed the totality of the circumstances in this case, the Court concludes that only one factor—the failure to inform the defendants that they were free to terminate the encounter and decline the search—weighs in favor of finding that their consent was involuntary. That single factor is heavily outweighed by the numerous factors discussed above that strongly suggest that the encounter was consensual and that defendants voluntarily consented to the search of their bags.

## II. Perry and Chavez Had Probable Cause to Arrest Jimenez

Probable cause exists "when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed" and that the person or property was involved in the crime. *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) (quoting *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004)).

"Probable cause is not a precise quantum of evidence." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). Rather, the relevant question is whether there was a "substantial probability"—"something 'more than a bare suspicion' "—that the person or property was involved in a crime. *Id.* (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

Here, the testimony at the hearing established that Jimenez told Perry that she was Gomez's girlfriend, and that she lived with him. Jimenez told Perry that the couple was traveling together to stay with a friend in Denver, but this story did not match the couple's tickets, which were for travel to Billings, Montana. This inconsistency suggests an attempt to dissemble or disguise the purpose for the trip. Jimenez appeared to have placed her purse on top of Gomez's suitcase rather than her own, which suggests a certain level of familiarity with his belongings, particularly the suitcase where narcotics were found. Finally, Jimenez looked down and lowered her shoulders as though she was in trouble when Perry began searching the small gift bag where the drugs were found, which suggests that she knew what the contents were. Jimenez contends that the foregoing facts do not support probable cause for her arrest and that merely traveling with an alleged drug dealer does not create a substantial probability that she was involved in a crime. Jimenez also contends that probable cause is undermined by the fact that Perry never asked Jimenez if her travel plans had changed and therefore never gave her the opportunity to negate the suspicion raised by having a destination that did not match her ticket.

Again, the Court disagrees. The facts presented to Perry at the time of the arrest met the threshold for probable cause to believe that Jimenez had committed a crime related to drug trafficking. Certainly, the evidence available to Perry at the time of the arrest may not have been adequate to support a conviction, but that is not what is required here. Rather, a reasonable person could have believed that due to her close relationship with Gomez and the green suitcase,

a potential falsehood given by Jimenez about the couple's destination, and Jimenez's own behavior, that Jimenez had committed an offense. Further, Perry testified that the mismatch between Jimenez's ticket and her stated destination raised a red flag because in his experience, sometimes passengers who are transporting illegal narcotics either lie about their destination, or do not know what their final destination will be. Jimenez argues that this discrepancy should not be considered in a probable cause determination because Perry failed to ask Jimenez why her ticket did not match her destination, and whether her travel plans had changed. Jimenez cites no authority that would support the notion that when presented with a potential lie or discrepancy in a defendant's story, a law enforcement officer must probe more deeply and ask additional questions in an effort to clear up the potential untruth. Further, Jimenez does not appear to have attempted to explain the discrepancy to Perry, and there is no evidence that he prevented her from doing so. In light of the foregoing, the Court concludes that it was reasonable for Perry to rely on the discrepancy in determining that he had probable cause to arrest Jimenez.

In short, a reasonable person could believe that there was a substantial probability that Jimenez was committing a crime. The motion to suppress should be denied.

**IT IS THEREFORE ORDERED** that the *Motion to Suppress Statements and Evidence* [Doc. 43] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**